We will hear argument this morning in Case 20-1029, Austin, Texas, v. Reagan National Advertising of Austin. Mr. Dreeben. Thank you, Mr. Chief Justice, and may it please the Court. This case involves a fundamental question about the meaning of content-based regulation under the First Amendment. The Fifth Circuit interpreted this Court's decision in Reed to mean that any time that an officer must read a sign to apply the law, the law is content-based. That holding is wrong and should be reversed. A law is content-based on its face when the text of the law singles out specific subject matter for differential treatment. The law in Reed did that by distinguishing ideological, political, and directional signs, a rule regulating off-premises advertising does not. The off-premises rule is an empty vessel that applies to all subjects and topics. It turns on the relationship of a sign to its location, not the content of its message. The Fifth Circuit's rigid rule does not further First Amendment values. Austin's law does not skew the marketplace for speech or suppress any ideas. But the Fifth Circuit's law does not have any untenable effects. Many ordinances can be applied only by looking at what a sign says. Temporary event signs are a perfect example. Strict scrutiny of such laws is unwarranted. Now, Respondent offers a new theory, arguing that any sign code provision tied to the function or purpose of speech is content-based on its face. But many neutral laws are tied to function. Sign regulation is inherently functional. Signs function to present information. And the regulation of solicitation is based on the function of soliciting. So long as these rules are even-handed, they are facially content-neutral. First Amendment review still applies, but the right standard is intermediate, not strict scrutiny. Because the Fifth Circuit applied the wrong standard, its judgment should be reversed. I welcome the Court's questions. Mr. Dreeben, would you kindly point to the language that the Fifth Circuit used that said you only need to read the sign, and if you have to read the sign, it's content-based? Yes, Justice Thomas. The Fifth Circuit's opinion is in the petition appendix, and the Fifth Circuit at several points described the rule that was adopting is one that involved reading the sign. And I don't have the exact page reference to it in front of me, but we cite it in our brief repeatedly. And that, I think, is the test that the Fifth Circuit applied. It drew it from what it understood this Court's decision in Reed to hold. But I don't think that Reed, in fact, did hold that. I'm going to ask you one more question. There are a number of hypotheticals that the Fifth Circuit asked petitioners' counsel, and one I'm interested in what your answer would be. Could Sarah place a digital sign in her yard that said, vote for Kathy if Kathy did not live at Sarah's house? So the answer to that, Justice Thomas, is yes, because under the Austin Sign Code, as it existed at the time of the litigation in this case, there was a political signage exception that was dictated by Texas state law that was incorporated into the Texas sign ordinance that was applicable in Austin. It's no longer, in effect, the way that it was at the time, because Austin has amended the code to remove any particular content reference to political signage. And I also think that, had the person who wanted to put up such a sign brought a challenge under the City of Ladue v. Gileo case, that would have been a different case than this one. But to circle back, I think, to the underlying question, the off-premises rule is a content-neutral rule that would apply to any form of speech. The question here is whether the off-premises rule automatically triggers strict scrutiny. There are other ways in which a law can fall afoul of the First Amendment. One of them is that, even if it's content-neutral on its face, if its justifications are tied to the content of the speech or the government's disagreement with the message, that would become content-neutral. I think I'm having a little bit of trouble because you're saying that if I could speak about, say, a hamburger, a barbecue place, Franklin's, I guess, would be the place in Austin. If you really want great barbecue, our hamburgers are great, but if you want great barbecue, go to Franklin's at a different place. That sign would not be acceptable under this ordinance, right? That's correct. The function of the ordinance is to limit off-premises advertising. But if I were at Franklin's, I could say, eat at Franklin's. That's right. The ordinance functions based on the relationship between the sign and its location. So, in other words, I can't say certain things unless I'm at a certain location. I can't say, eat at Franklin's, unless I'm at Franklin's. Yes, because what Austin is trying to do is regulate the proliferation of off-premises advertising. But I don't understand how that's not content-based if I could say, eat at Franklin's, if I'm at Franklin's, but I can't say it if I'm at McDonald's or some other place at the location in Austin. So, I understand that, and I understand that it's a restriction of speech. What this case turns on is the meaning of content-based restrictions of speech within this court's First Amendment jurisprudence. And I think the Fifth Circuit interpreted Reed and the impulse behind Your Honor's question is that if you have to look at the content of the sign in part to determine whether it is legitimately within the code, then it becomes content-based. That is not my understanding of what content-based has meant under this court's jurisprudence. Let's start with the court's case law and the actual cases that this court cited in Reed to illustrate what it meant by content-based. It cited Sorrell, Carey, and Mosley. Sorrell is a case about the restriction of dissemination of pharmaceutical-related information. Mosley and Carey both involved picketing ordinances that singled out labor picketing as subjects that were permitted and all other picketing was banned. That provides a frame of reference for what the court meant when it said in Reed itself that laws targeting specific subject matter are content-based. At the other end of the spectrum are laws that are even-handed in their application but deal with a mode of speech, like solicitation. This court in the Heffron case dealt with a law that limited solicitation of funds at a county fair to a particular booth. And the court said as long as it's applied even-handedly to solicitation of all types, it is a content-neutral restriction of speech. It doesn't get a free pass. It goes to intermediate scrutiny. But an open-ended general law that applies to all forms of subjects, all topics, even if it's restricted in the kind of speech that's addressing, remains content-neutral. Mr. Dreeben, what if the rule said no signs within 25 yards of the highway? Does that violate the First Amendment in any way? No, it doesn't. What if it says no signs within 25 yards of the highway except for signs advertising a business in Austin? So I think that, Chief Justice Roberts, once you add the specific topical feature to the regulation, as you did, signs related specifically to Austin or political signs or any other religious signs, any other specific subject matter, you can't take it out of content-based regulation by saying it only applies to a particular location. But your test, you said, is if it singles out a particular subject. Yes. So what subject is that singling out? Well, I think that one is singling out businesses that are in Austin as a subject matter. Well, it singles out location, I would have thought. It singles out location and where the sign can be, and then the topic of the sign that is written on the sign is language that's being regulated. And even if Your Honor thinks that that would be content-neutral under my test, and perhaps it would be depending on how the court understands topic, Austin's law is far more general than that. It doesn't describe any particular topic, unlike the law in Reed, which differentiated between ideological signs, which could be of one dimension and one duration, political signs, which could be of another dimension and another duration, and event signs related to charitable meetings and religious meetings. There you have a jurisdiction singling out different kinds of speech and creating a hierarchy of values among those topics. And that resembles what was going on in Searle, where the court said you're distinguishing on who can get pharmaceutical-related information based on the speakers to whom you're providing it. It aligns with Kerry and Brown, and it also preserves space for the solicitation line of money, which does require you to ask, what is the person saying? What is he asking for? But it doesn't differentiate within that broad topic of religious speech, political speech. Why isn't it as much of a subject matter as in my hypothetical? Presumably the signs off-premises are telling you how to get to the premises, as opposed to any other message. Why isn't that as much of a subject matter test as the one about how close to the highway? I think that's for two reasons. One is locating it within this court's precedent. There is a differentiation between laws which even-handedly regulate a broad class of subject matters or topics, and do not differentiate among them according to what the court's cases have carved out as topical preferences by the government where it is skewing the marketplace for ideas. So within the court's jurisprudence, the court itself has articulated a line between a regulation of speech that covers all forms of solicitation, which obviously does require, in some ways, saying, what is the subject of the speech? The subject is asking for something, asking for money, asking for a donation of some kind, but not restricting it within any particular topic. And the first- Signs for direction. No, 495, Route 495, three miles straight ahead, two miles straight ahead, one mile straight ahead. How do they fit in this? I'm just- maybe basic. Maybe everybody understands but me, but I don't understand. So, Justice Breyer, I don't see those as the kind of signs that are providing topical and subject matter distinctions as this court- No, no, they only apply to directions. I mean, they only apply to where something physically is. I mean, what's the difference? This is a question of generality. Of generality, it's absolutely specific. No, I think what the generality that I'm referring to is how general does this court require a law to be- No, no, I'm just wondering why isn't it content discrimination for a town to say you can put up directional signs? Indeed, we put them up all over the place. Because the question that the court is asking in content-based regulation is, is the court going to apply strict scrutiny? And strict scrutiny is the highest level of review that the court engages in. And the reason- Hey, you know, if you go to Highway 93, you will see that every mile, for five miles, they say, how many miles left to get to Route 495? They don't have to do that. They could have like two of them. Correct. And you're a pest, too. You get mixed up. And I think Your Honor has put his finger on why strict scrutiny is an inappropriate lens to review laws that don't have the potential to skew the marketplace for ideas. Well, by the way, it does. It does, because it is the result of those marketplace of ideas transmitted to the legislator of what kind of regulation we want. All right? So it's all right in that First Amendment effort to see that the people are connected to the laws. So I understand, Justice Breyer, the view of the First Amendment that sees regulation as the transmission of the people's beliefs into laws. We're focused here, I think, on a narrower question. I still want to know on your theory, and whatever it is, if the hamburger thing or the food advertising and so forth is a separate category that by itself leads to strict scrutiny, why doesn't direction giving lead to strict scrutiny? It's not supposed to be some zinger question. It's just that I don't understand the answer. And I would like to know what you think. Well, our view is that neither of them is subject to strict scrutiny, Justice Breyer. The on-premises, off-premises line is a broad category that is not limited as to particular types of subject matters. It applies even-handedly to all of them. And it may have discriminatory effects on some forms of speech. It may not. Discriminatory effects do not make a facially content-neutral law a content-based law. Mr. Dreeben, one way to ask the question is much depends on your theory on what a topic is or what a subject matter is. And you're excluding various things from that label. You're excluding sort of off-premises, on-premises rules. You're excluding navigational guides. You're excluding directions. And all of this might make, to me, a good deal of sense. But I guess one question is sort of where do you draw the line? How do you decide what counts as a topic, such that it leads to strict scrutiny, and what doesn't count as a topic, such that it wouldn't? So, Justice Kagan, we have examples that provide guideposts in this Court's cases. And the Court's cases where it has actually applied content-based rules to a statute on its face have involved a level of specificity and a type of idea that's akin to what was going on in Reed. Political ideas, ideological speech, directional signs that are tied to particular types of meetings. There, it was nonprofits. Religion was right there in the statute. I don't think that it was a surprise that the Court said that those were content-based limitations on speech. Other cases that provide similar examples, which were cited in Reed and relied on in Reed to describe what the meaning of content-based is, were Sorrel, where you're dealing with a category of information, pharmaceutical information. And the labor picketing cases that I also referred to were cited in Reed itself. That provides an example at one end of the spectrum where you do have specific topics and ideas that are singled out. And the concern arises, looking at that level of specificity, is the government seeking to suppress any idea or skew the marketplace for speech? And the answer is yes. On the other end of the spectrum, you have laws like solicitation. You have the categories of things that Justice Alito described in his concurring opinion in Reed for three members of the Court, which recognized that there were a variety of reasonable time regulations that should not be deemed content-based under the Court's analysis because they do not have the potential for skewing the marketplace for ideas or the government putting its thumb on the scale. Thank you, Mr. Dreeben. Justice Thomas, anything further? Justice Breyer? You haven't said anything this morning about a facial challenge and overbreath. Is there anything you want to add on those points? Yes, Justice Alito. The law in this case was applied to respondents' billboards, and I don't think that there is any significant dispute that they primarily display commercial speech and commercial advertising. And this Court held in 1981 in the Metro Media opinion, which was fractured, but reduces to the proposition that a jurisdiction can decide to have on-site, on-premises commercial advertising and to totally eliminate billboards, billboards being the quintessential example of off-site advertising. And when the city of Austin denied the application for signage transformation into digital signage, it specifically said, you are a nonconforming billboard because of your off-premises commercial speech. And that was the basis for the denial. That basis infringes no First Amendment right under this Court's decision in Metro Media that was reaffirmed later, both in the Taxpayers for Vincent case and the City of Ladue case. And as a result, the only way that respondents can prevail is by establishing that the application of the statute either to their noncommercial speech or to someone else's noncommercial speech is sufficiently broad, real, and substantial, I think are the words in the Court's overbreath jurisprudence, in relation to the class of legitimate speech, such that you would invalidate the ordinance across the board. Justice Sotomayor? Yes. The other side suggests that an on-off-premises disparentiation might be okay if the regulation was limited to the size of the sign, to a certain distance from the building, et cetera. I'm unaware of any off-on-premises legislation that existed at the time of Austin and the time that Justice Alito wrote his concurrence that defined on and off in that way. Are you? I am not either, Justice Sotomayor, and I think that there's a sound reason why jurisdictions do not legislate in that manner. The very workable distinction between on-premises signage, which is viewed as necessary to allow people to find the businesses that they want to patronize or visit the homes that they want to go to, has been embedded in the law for more than half a century. Cases dating back as far as this Court's decision in Railway Express v. New York examined a rule that prohibited mobile billboards on trucks in the city of New York, but allowed the identification of the business on the truck itself. And this Court, of course, dealt with a similar on-premises, off-premises distinction in the suit. I think it's extremely implausible to think that this multiplicity of jurisdictions in every kind of state, every kind of locality, have all adopted it in order to suppress speech. They haven't. What they've done is tried to have an orderly, organized, rule-governing signage in towns so that you preserve aesthetic values and avoid visual clutter, and you avoid the safety risks of having an undue amount of signage, particularly large billboards, 672-feet glowing digital billboards, which create distraction hazards that jurisdictions want to avoid. And a rule that tied the sign to a distance from a building would not fulfill the goal of allowing business owners to tell people where their stores are, and at the same time of off-premises signs. Thank you. Justice Kagan? Justice Gorsuch? Mr. Dreeben, I just want to make sure I understand your responses to Justice Kagan and Justice Breyer about the line between content and subject matter or topic. Am I correct in understanding you that you think it's a question of degree or a level of generality? Yes, I think it is a level of generality, and the Court's cases provide the examples Okay, okay, thank you. And did I also understand you to agree that strict scrutiny is appropriate when we're trying to decide what level of generality to apply, when the government is in a position to put its thumb on the scale, I think were your words, in the transmission or competition of ideas? Yes, I think that's the function of strict scrutiny. It expresses a degree of judicial skepticism towards a regulatory scheme that has the potential for distorting the free exchange ideas which the First Amendment promotes. Thank you. Justice Kavanaugh? Mr. Dreeben, I just want to ask a follow-up about how you think the tiers of scrutiny fit together with some of the other arguments that you've been raising and that are in the amicus briefs about history and precedent. So if I understand it correctly, if it's content-based, you agree that strict scrutiny applies and you are not making an argument that you could prevail on strict scrutiny, presumably because you don't think you have a sufficiently compelling interest under this Court's precedence. But if it's content-neutral, you say intermediate scrutiny applies and that you win because you have a sufficiently important or significant government interest, even though not compelling. Is that correct so far? Yes, with the addition that the fit requirement under strict scrutiny of being the least restrictive alternative is virtually impossible for signage regulation to meet. Okay. And then a lot of the rhetoric, though, in your position, you just mentioned this in response to Justice Sotomayor, and it's not just rhetoric, it's important to the that is historically rooted, still common in jurisdictions all over America, and that that somehow indicates some acceptance of this consistent with the First Amendment. And then you also mentioned precedent, metro media, and the follow-on. My question is, how does that historical practice and the commonality of the restrictions and the precedent affect whether we decide the threshold question of content-based and content neutrality? So I think, Justice Kavanaugh, that they provide important corroborating data that Austin's traditional off-premises, on-premises distinction, also reflected in the Highway Beautification Act, is not an effort to suppress speech and doesn't require the Court to say, this law on its face is content-based. Therefore, we have to go to the move where we have rigorous inspection of the empirical support for the jurisdiction's rule, and we have to measure the fit against our view of could they have done it in a narrower way, which transfers decisions, coming back to Justice Breyer and democratic accountability, from the municipalities that are dealing with these problems, which are very multifarious and varied all over the country, to the courts. And if the Court is trying to decide, do we need strict scrutiny here when we have a law of the generality of off-premises, on-premises, its pedigree and its acceptance in this Court's decisions under intermediate scrutiny for 50, 60 years now, without a vanishing of ideas and the vibrancy and flourishing of signage, should give the Court some comfort that it's on the right track. If it reads Reed exactly for what Reed said, when you have specific subject matter that's targeted, you're in content-based land, and therefore you go to strict scrutiny. I'll just close with this comment. The tension for me, just so you know, and the other side knows, is the tensions between this history and common practice, which means a lot to me, but I don't want to water down what it means to be content-based. I think the risk of watering down strict scrutiny comes from expanding content-based to places where it's never gone. And a respondent will tell you that his theory is based on function or purpose of a sign, which in Reed has that language. We understand that language to be when a jurisdiction regulates through function or purpose as a proxy for content, then you go to strict scrutiny. And the law in Reed had that, where it said that a political sign was a sign that was designed to influence an election. So it's based on its purpose, not on specific language in the sign. And the Court treated that as content-based, and appropriately so, because their function was a proxy for a specific subject matter. Thank you. Justice Barrett? Thank you, Mr. Dreeben. Mr. Schneider? Mr. Chief Justice, and may it please the Court. The Court of Appeals held that a signed ordinance that distinguishes between on-premises signs and off-premises signs is just as suspicious as an ordinance that distinguishes between Democratic signs and Republican signs, or between religious signs and secular signs. In its view, at page 14a of the Petition Appendix, any law that requires the enforcer to read a sign or listen to a message must be subject to strict scrutiny, even if the law applies even-handedly to all topics or viewpoints. The Court of Appeals said that Reed compelled that result, but Reed dealt with a law that drew classic content-based distinctions between specific topics or subject matters. It did not address categories like off-premises advertising, which have no inherent content of their own. And adopting the Court of Appeals' understanding of Reed would conflict with numerous other precedents, including this Court's repeated recognition that laws regulating solicitation are appropriately evaluated using intermediate scrutiny, even though their application depends on whether a speaker is asking for money. The Court should apply that same intermediate scrutiny here and reverse the Court of Appeals judgment. I welcome the Court's questions. In your brief, you recommended that we apply the Secondary Effects Doctrine. That's true, Justice Thomas. To be clear, we think that we agree with Austin's argument that the ordinance here is not content based on its face. We think that the case could readily be resolved on that ground. But we also think that the Secondary Effects Doctrine would apply here in a way that it reverses the Court of Appeals' judgment. Has this Court applied that doctrine outside of the adult entertainment business cases? The Court has, Your Honor. The Court applied it in wards to uphold the noise ordinance at issue there. And then the Court has also applied it in other cases but found that its requirements were not met. So in Discovery Network, for example, dealing with Cincinnati's distinction between newspaper and traditional newspapers, the Court applied City of Renton but held that it wasn't satisfied because there was no distinction in terms of the danger of littering and the danger of visual blight between commercial newspapers and non-commercial newspapers. The Court has not suggested that the Secondary Effects Doctrine only applies in the adult entertainment context. And the fact that when the Court has applied it in other contexts, it's found that it wasn't satisfied just shows that it's a demanding requirement, not that it shouldn't apply in those other contexts. Thank you. I guess my question is similar to Justice Thomas's. You rely on the City of Renton case. We've cited it a few times and devote a page or so to it. And I have to say I've always thought that precedent was a bit of a stretch. I mean, they say no adult theater within 1,000 feet of a residence and then defend it on the theory that it's got nothing to do with the fact that it's an adult theater. It has to do with the fact that it generates more trash or traffic or whatever. I mean, do you have any other case that's like that? It's defined in terms of the content of the theater, and yet we don't think it has anything to do with it. So I don't think you'll like this one better, but Alameda Bookstores deals with the same thing I didn't like. But to be clear, Your Honor, I think this case, and I think this goes to a question that maybe you were asking Mr. Dreeben, or no, I'm sorry, it was Justice Kavanaugh was a category of speech that doesn't have any inherent content. And so if you want to think about how to sort of recognize that as a separate category that we're not going to treat as content-based without watering down strict scrutiny, I think the sorts of interests that the court looked to in the city of Renton in terms of deciding that a law that you could plausibly say was content-based on its face would nevertheless be treated as content-neutral. I think here it's much, much harder to say that the law is content-based on its face. And so you could apply those same rationales here to conclude that it doesn't make any sense in terms of the First Amendment values that we're trying to further to treat a law like this one that has no inherent content, that doesn't reflect any government approval or disapproval of particular messages. It doesn't make sense to subject that law to the same scrutiny that you would apply to a law that said you can have Republican signs but not Democratic signs. I mean, what is your theory? I mean, I've said over and over, as you know, what's the answer? You want to know whether a law is content-based? You have to read it. Every law, every law is written in English. And if you go look at the statute books, which there are hundreds of, most of them deal with what somebody should say. That's what securities law is about. That's what energy law is about, and half of it. That's what railroad laws used to be about as far as fair collection was concerned. They're one after the other. Okay? So I stop at stage one. What is content-based? What is your theory of what is, unless we're to apply strict scrutiny to every regulation on the books? What's the rule? And what is it? I mean, maybe you can't explain that. There isn't enough time and so forth. So I'll go back to my state of confusion. No, I appreciate the opportunity, Justice Breyer. I think that this Court's cases in drawing that line have recognized the sort of problem that you're identifying. And therefore, they have distinguished between cases that are laws that talk to specific topics like politics or religion or ideology. Every law on the statute books in the SEC part, probably accepting 3%, talks about what was the word you said? Specific content. So inherent— That's true of railroad regulation, airline regulation, energy regulation. You name it. It's about content. It is not about sign direction. It's sign direction, lawyers. So I think in this context, you don't need to deal with all of those other areas. I think the important thing here is that a law about off-premises advertising has no inherent content of its own. It only sort of caches out when you look at what's being sold or offered at a particular— That's why I asked you what your theory was and your honest theory about it, not because I can't think of distinctions of this case. I perhaps can't. But what I want to know, since I've been so hostile and unhappy with the theory for the reason I stated, what is the government's theory? You somehow have to deal with these cases. Do you have a theory? So we have dealt with the cases as they've come. I think here, in terms of addressing the specific regulations that are at issue here, we think the fact that Austin's law and the Highway Beautification Act, the distinctions they draw don't have any inherent content means that it doesn't make sense to subject those to strict scrutiny. Justice Thomas, if I could, I'd like to go back to your Franklin's example. A Franklin's example is good to go back to, but also substantively. I think you could have given an almost identical hypothetical in Hefferon, for example. So Hefferon was the case about the regulation of solicitation at the Minnesota State Fair, and you weren't allowed to solicit except at booths that you had rented. So you could walk through the Minnesota State Fair and you could say, vote for Tim. That was fine, because that wasn't solicitation. But you couldn't say, give money to Tim's campaign. And the court said, nevertheless, that that was a content-neutral justification because the ban on solicitation applied regardless of the topic you wanted to solicit on. And to give another example, in McCullen, this court confronted a statute that had an exception for speech within the scope of employment. And the court said, the court acknowledged in that case that you might have to look at what the person had said in order to decide whether it was actually within the scope of their employment, but that it was nevertheless content-based because it didn't prefer any particular subject matters. There was disagreement in that case about whether the way that particular requirement was framed reflected viewpoint discrimination because it was only certain people who could speak within the scope of their employment. But I at least don't see any disagreement in the opinions there about the principle that a generally applicable law about speaking within the scope of employment would not be content-based. Counsel, you talk about how this doesn't have any viewpoint discrimination, but I haven't heard anyone yet engage with the argument made by the other side that it necessarily favors majoritarian speech because, say, there are 1,000 Christian churches in an area and 12 mosques. By definition, a rule that favors location-based speech over non-premises speech is going to favor the majoritarian voice there. Or, say, a small civil rights organization seeking to advertise for members in an area where that's not a popular viewpoint and there aren't very many places where they could advertise on location would also have that effect. Would you care to respond to those concerns? I would. Thank you for that. I'd say two or three things in response to that. The first is that the part of the test that Respondent has put at issue is whether the law is content-based on its face. And so to analyze that, you look at the face of the law, not how it sort of cashes out in practice. I understand, but on the face of the law, it makes a content-based distinction in the sense of location. It makes a location-based distinction. We could at least agree on that. And so why doesn't that have a knock-on effect on content? Because that location-based distinction, it doesn't have any inherent content of its own. It depends on what happens at the particular locations. No, but I understand that point. But doesn't it necessarily favor majoritarian voices? Wouldn't you agree with that? I don't think it necessarily does. And even if you think that it does, the court has said repeatedly, the court said this in Ward, it said it in McCullen, that the fact that a law has incidental effects on certain speakers or messages does not make the law content-based. There's no disparate impact theory of the First Amendment. And so here we think it makes sense to look at the law and recognize that the category of off-premises advertising doesn't have an inherent content any more than speech within the scope of employment or solicitation. And therefore, it's sufficient to address that law with intermediate scrutiny, which is still demanding. But would you at least agree that it does have a disproportionate effect on majoritarian and minority voices? I think it would depend. I mean, I'm not sure it's exactly majoritarian and minority voices. It would depend on who has property in the city of Austin. Property voices. We could agree that it favors property voices then, right? Yes, Your Honor. In some respects, it does. I don't think you can rest the case on that, though. Respondent concedes at page 39 of the red brief that Austin could adopt an ordinance that regulates signs based on whether they generate revenue. And it could also regulate on commercial speech. That would be an option, for example. And in fact, Austin's done that already in the wake of this lawsuit, right? I understand. It could, Your Honor. And I think that that's a significant thing. Or it could, as Chicago has, focus on the brightness and the size of signs and things like that, right? So it could. If you look at the amicus brief of the International Sign Association, it talks a little bit about the experience in Chicago. And Chicago's experience was that they did away with the on-premises, off-premises distinction and went to a rule about allowing signs up to 100 square feet without regard to on-premises or off-premises. And those signs proliferated throughout the city. So those laws, they are alternatives if the government has to use them, but they're not nearly as effective. And we don't think that the First Amendment requires— Oh, I mean, the First Amendment prevents—that can't be the test, how effective a law is at suppressing speech. I mean, that's never been—the First Amendment's always pretty inefficient, we'd agree, wouldn't we? I wouldn't say that the First Amendment is always inefficient. I would say that if you're applying intermediate scrutiny, then which we think is the appropriate framework here, then Austin is not required to adopt much less effective regulations of signs. The other thing I'd pick up on, you mentioned commercial speech. We don't think that regulating just commercial speech would adequately protect the government's interests in this case. But at the very least, we think Respondent has not challenged the city of Austin's ability to regulate commercial billboards. And so the most that Respondent could get from this case would be a declaratory judgment saying that they are entitled to digitize their billboards and display non-commercial messages on their billboards. Now, so no matter what or how you subject this to strict scrutiny or not or intermediate scrutiny, this favors not on the basis of majoritarian rule but on the basis of wealth. These big billboards, you've got to have a lot of money to put a sign on them. To build them, to have put a sign on them. Not every property owner can do it. So I don't understand your concession on the majoritarian rule issue. Your Honor, I didn't mean to concede that they would – I thought I didn't concede that these sort of favor majoritarian – What it favors not to do it is favors people with money against the poor, period. Your Honor, I think it's hard to know exactly what the results would be in sort of practice, which is another reason why I think it makes sense to look at the face of the statute rather than trying to sort of predict the sociological implications. I agree with you wholly, which is – my point is that it's not favoring the majority over a minority or one group other than the basis of wealth, but that happens in speech, period. Wealthier people can speak more. I think that's right, Your Honor. And I think that's why the Court has not embraced a disparate impact theory of the First Amendment and why it would be a mistake to do so here. What would be the effect of adopting the Respondent's test or the Fifth Circuit's – the test that's attributed to the Fifth Circuit? If you have to read it, it's a content-based test on federal regulations. Justice Breyer mentioned some of those. Start with regulations that require disclosure. Those are all content-based. All compelled speech is content-based, is it not? Do you understand this to apply to compelled speech? I'm not – you know, it would obviously depend on the Court's opinion. I'm not sure what Respondent would say to that. It would certainly raise a host of really difficult questions about things that have long been considered settled. Mr. Snyder, I was fascinated reading your brief that when the Highway Beautification Act was passed in 1965, one of the category of signs that were – was allowed, would otherwise be prohibited, were signs advertising the distribution by non-profit organizations of free coffee. Is that still in effect? That provision is still in effect. I believe some states do allow that. We would not suggest that as a content-neutral distinction. The analysis for that distinction would be quite different from the one dealing with on-premises and off-premises signs. Why – I mean, it's coffee, it's not tea. That seems content-based. I agree. We would not – we would not dispute that that is a content-based distinction. Are there any of these left? There are some left. They're put out when organizations are attempting to raise money to let you know that you can stop at the rest stop to get a coffee to keep driving. And so there's a safety – But it's free. How much money do they raise? They take donations. Oh, okay. Just a comment. Justice Sotomayor? Justice Gorsuch? One question. If you're concerned about safety and blight, which are the two concerns that the city has articulated, the question we have to ask is whether those interests could be served in ways that wouldn't draw a distinction based on content or wouldn't infringe speech generally, whether you could serve the same interests. And couldn't the city do so by limiting the number of signs, the number of billboards, the placement of billboards, and the size of billboards to achieve the safety and blight interests just as effectively? I realize that'd be a lot of change for a lot of jurisdictions around the country, and that matters, but put that aside for now. So two things. The first – I don't mean to dispute your question, but one of the premises of your question is that that wouldn't restrict speech. And I just disagree with that premise. It would restrict speech. It would do so on different bases, but the question is whether the off-premises, on-premises distinction makes us especially suspicious. But two, sort of the substance – Satisfying the scrutiny, whatever the scrutiny is, satisfying the scrutiny, can't they achieve the interest, whichever tier of scrutiny it is, can't they achieve the interest by placement, number, and size restrictions rather than anything that has to do arguably with the words that are written on the sign? No, I don't think they can nearly as effectively because the on-premises, off-premises distinction sort of tracks the places in which signs provide the most value in terms of organizing the community. If you think about walking through a downtown area that didn't have on-premises signs up, it would be impossible to find the store or the church that you were trying to get to. And so on-premises signs serve that function in a way that off-premises signs just don't. And so trying to treat both of those things the same and use, you know, number or – Don't a number of states don't use this distinction? I don't know if people are just running around lost in all those states, but they presumably find their way to the place. So they do find their way to the place. I don't think jurisdictions have completely eliminated on-premises signs, but I think it's far more difficult to accomplish the objectives of eliminating visual blight and protecting traffic safety without those things. And we think that under intermediate scrutiny, which is the appropriate standard here, that the city's interest in doing that more effectively suffices. Justice Barrett? Just one. So this is similar to Justice Kavanaugh's question. Here, I mean, it seems to me that this interest in avoiding blight and distraction and all that could be achieved because Austin has limited – it's only grandfathered in the billboards that were there at the time the ordinance was passed, right? That's correct. So why – if the off-premises, on-premises distinction, why couldn't you achieve that simply by limiting it so you're not going to get any more billboards because no more can be built? Why can't on-premises just mean on-premises regardless of whether it's, you know, advertising Franklin's barbecue or the hamburgers inside? I mean, who cares what it says because, you know, as the petitioner pointed out in his brief, if it's on-premises, it's going to be naturally limited in size. People aren't going to put up a big billboard that obscures the front of the building. So couldn't you just achieve the same thing in size limitations and who cares what it says? I don't think so, Your Honor. I mean, if there's no on-premises, off-premises distinction, then, I mean, maybe you wouldn't want to put up a sign face that completely covers your building. But if you've got a plot of land that doesn't have a building on it or a plot of land with some vacant space, you might put up a huge and garish billboard or you might buy that space in order to do that. I mean, that's sort of how these billboards end up there in the first place. But couldn't it be limited in terms of size? That would be content neutral. You could limit it in terms of size. As I mentioned, that's what Chicago did. And the result was that you had a ton of 100-square-foot billboards all over the city of And having the grandfathered thing wouldn't solve that problem? So I think the grandfathered thing serves a couple of functions. One function is that part of the reason for having a grandfather clause like that that limits the modifications you can make to a sign is an interest in gradually phasing out those off-premises signs. The federal government did a similar thing after enactment of the HBA and was explicit that part of the purpose of that was to eventually have those signs come down. And we think Austin has the same interest. It's not just saying we're going to have these signs for all time. It can have an interest in encouraging people to not keep using them. Thank you. Thank you, counsel. Mr. Shanmugam? Thank you, Mr. Chief Justice, and may it please the court. The city of Austin denied respondents' application to convert its existing signs to digital signs. And it did so on the ground that the signs advertised off-premises activities. Under this court's decision in Reed, Austin's distinction between signs advertising on-premises and off-premises activities is content-based. That distinction turns on the subject matter, function, and purpose of the content of the messages on the signs. And it has the effect of prioritizing certain messages from certain speakers and limiting, if not prohibiting, others. The fact that Austin's regulation does not prohibit speech on an entire subject and that the application of the regulation depends on a factor in addition to the signs' content does not render it content-neutral. The court should therefore apply strict scrutiny. Under any standard of review, however, this is an easy case. A through-line of this court's First Amendment cases is that whatever the standard of review, a regulatory distinction between different types of speech has to bear some relation to the governmental interest asserted. Here, the challenge restriction, Austin's prohibition on the digitization of the small number of off-premises signs flunks any standard of review and verges on the irrational for Austin to permit digital on-premises signs without any limitation, but to prohibit the digitization of the small number of grandfathered off-premises signs. That differential treatment bears no relation to Austin's asserted interest in safety and trial to support it. All that the court need do here is to hold that the digitization ban is invalid. Other restrictions based on similar on- and off-premises sign distinctions may well satisfy strict scrutiny, and numerous jurisdictions have already modified their definitions in the wake of Reed to render them content-neutral. The Court of Appeals correctly held that Austin's digitization ban violates the First Amendment and its judgment should be affirmed. I welcome the Court's questions. Uh, Counsel, why, uh, wouldn't we, uh, analyze this under commercial speech doctrine? So, um, first of all, Austin didn't seek review on the alternative theory that even if an on-premises-off-premises distinction is subject to strict scrutiny, Austin should somehow still prevail. Now, I would note, as I noted at the outset, that even under intermediate scrutiny, we believe that we should prevail because there's simply no fit here between the regulation at issue and the distinction, whether it's the distinction between on-premises and off-premises signs or any differential treatment of commercial speech, and Austin's asserted interest. But we ultimately think that strict scrutiny should apply across the board here for the simple reason that Austin's regulation does not in any way disaggregate commercial from with regard to the speech that is being limited here, which is the speech that my client would display on its digital signs. Now, we don't even know what that speech is for the simple reason that my client has not yet leased out its signs, and at any given time, the parties that would lease those signs would presumably change. But I think that the critical point here is that the regulation in no way draws a distinction between commercial and non-commercial speech. And again, the real focus here should be on the speech that is being limited. And this case is no different from the Riley case that we cite in that regard. I think where you have an ordinance that covers both commercial and non-commercial speech and that speech cannot be disaggregated, the natural step is to apply strict scrutiny. And indeed, even in Metro Media itself, after discussing commercial and non-commercial speech separately, the court did ultimately invalidate San Diego's ordinance on its face. So it left questions of severability for the lower courts. All right, so I'll tell you why we let the home, my own kale shop. I sell fried kale. And right outside, I want a big picture of kale that lights up, okay? It's mine. This is my shop. I want to decorate it the way I want, a strong interest. I don't have the same interest in what the billboard 40 miles outside the town says about my kale shop. Okay, there's your difference. And the grandfather is because we love grandfathers, okay? There we are. And that's historic. You go back to the year two, you'll discover those kinds of distinctions. So there are distinctions. And therefore, I have to get to the content-based. Now I'm back at Justice Alito's question. Content-based? Hey, the whole SEC is content-based. And what about the infinite number of FDA rules that say you better disclose how much sodium there is? That's not content. Sodium? It isn't. It's salt. But salt, by the way, is a kind of content. And it's not good for you. But regardless, FDA, SEC, try the energy world. You better disclose, Mr. Smith Energy, how much coal you're burning, okay? And we can go on through the whole U.S. Code. So as you know, my conclusion is this makes no sense. It does make sense in the context of where you're trying to do time, manner, and circumstance. It does make sense in the context of where you're trying to see if it's viewpoint discrimination. But as to the rest of it, no. Okay? What do you want to say to me? I say just get on the boat. It's passed, sailed. Do your best. Or what do you want to say? Justice Breyer, you've been nothing if not consistent in your view that the court should not treat— It's one person. So therefore— Well, let me address your view directly, which, as I understand it, has always been that whether or not a regulation is content-based or content-neutral should not be dispositive. It should be one of the factors in the analysis. And as you know, you gave many of those examples in your concurring opinion in Reed itself. And I want to address those. But first, let me go directly to the fried kale hypothetical and the question of why this is content-based. And perhaps I think the easiest way to think about that is to look at it from the perspective of the owner of the premises. No, I agree it's content-based. I agree with you there. Absolutely. So now what? And you can say I should get on the bandwagon irrespective of the fact that, to me, doesn't make any sense. Well, let me— It wouldn't be the first time. Let me explain to you why you should get on the bandwagon or, at a minimum, why you shouldn't be troubled by the bandwagon rolling out of the station here. And that is for the simple reason that if you think about it from the perspective of the owner of the premises, that owner's speech is being limited and plainly being limited on the basis of content. And let me give you a hypothetical of my own, if I may. Let's say that you're a church and you want to advertise the services that take place every Sunday on your premises. Of course, under Austin's ordinance, you can do that. But what you can't do is to use your digital sign to advertise an interfaith service that might be taking place at the Jewish synagogue down the road. That is a limitation on the subject matter of your speech. And so while it is certainly true, as we say in our brief, that this regulation defines the regulated speech in terms of its function or purpose, I agree with my good friend Mr. Driven that ultimately that is, as this court put it in Reed, a way of sort of getting at the fundamental question, which is whether the regulation in question is regulating speech in terms of its subject matter, whether it's distinguishing between different types of communicative content. And yes, that is a test that turns on reading the sign. But in a very specific way, it turns on whether or not you are examining the content of the sign, determining whether or not the regulation applies. Counsel, easy rules and bright lines are always attractive to people, but human nature is not bright lines. Life is all gray. You have to read things to know anything about them. You have to read a sign to see if it's covered by the First Amendment. And you have to read it to know whether it's obscenity or not. Directional signs, as Justice Breyer said earlier, you have to read it to see if it's directional. And yet I think it's illogical and contrary to any common sense to think that a regulation that says states can put up signs, only states can put up directional signs on highways, that that's content-based. It's just not logical. And so I think what Justice Breyer is trying to get at is that history teaches us, it's just the history in this case. I joined Justice Alito's concurrence, that there are certain types of functions, not or a direct effect on speech in the same way as a regulation that says only the religious, as in Reed, that only religion can do X, politics can do Y, and this can do Z. Reed was clear for everybody. It was 9-0 on the result. But you can't read a line out of context. Are you suggesting that Reed overturned all the precedents that your colleagues on the other side cited? No, certainly not, Justice. So don't we have to read Reed in context? Of course, Justice Sotomayor, but I hope to convince you that the regulation at issue here is really indistinguishable from the regulation that was at issue in Reed in the relevant respect. And we certainly don't think, as we set out at great length in our brief, that this court needs to disturb any of its First Amendment precedents to rule in our favor. And I'm happy to address the examples that Justice Breyer gave and some of the— Well, how about Heffern? We held the restriction on solicitation to be content neutral because it applied even handedly to all who wish to distribute and sell written materials or to solicit funds. So it differentiated between solicitation and just endorsement. I think the best way to understand this court's solicitation cases, and I would put this court's picketing cases in the same category, is that they are cases that involve conduct with an expressive component. And so this court, in the solicitation context, has distinguished between— Well, this is conduct, too, conduct of having an off-site grandfathered billboard. By the way, going back to Justice Barak's question, how about if Austin said, we're going to treat on- and off-premises the same? You can only advertise on-site premise information, and you can have a billboard on on-site. But forget it. Now that the First Amendment requires us to treat you all equally, you can't continue to advertise off-premise things. Would you be happy with that? No, I don't think we would be happy with that, because I think that that is not so far removed from the regulation at issue here. In other words, if you define it in terms of what is being advertised—namely, only on-premises activities can be advertised—then you're really left with— So you're telling every state to basically say, no signs, period. No, not— No signs just on services. You're really taking a radical step in saying your only choice is no signs, period. No, not at all. And I want to go to the concurring opinion of Justice Alito, which you joined, Justice Sotomayor, because I don't think that that opinion, you know, should be read to stand for the proposition that any distinction between on-premises and off-premises signs is content neutral. Let's suppose, for instance, that you had a provision that banned signs advertising religious services not located on the premises. That would plainly be a content-based distinction. And I think merely removing religious from that provision doesn't render the provision any different. But this sign was no different. This regulation is no different than the vast majority of other regulations in existence at the time. And Justice Alito said we shouldn't read to extend to those. I grant you, Justice Sotomayor, that there are many jurisdictions that had on-premises, off-premises regulations like the one at issue here. Now, I will note, as Austin concedes, that many jurisdictions in the wake of Reed modified those definitions to render them content neutral, whether by looking to the source of revenue as the state of Texas itself did and as Tennessee and many other states did, or modifying their ordinances in other ways. And so I really don't think that you can draw the inference that simply because a distinction is framed in terms of on-premises versus off-premises, that that renders it content neutral. The inquiry is the same. It is whether or not the regulation at issue defines the regulated speech in terms of its subject matter, function, or purpose. I would note, is the Austin Code content-based as applied to the billboards that are at issue here? Perhaps I don't understand the underlying facts of the case, but as I understand it, your client has billboards. They are off-premises in the conventional sense of the term. They are not in front of a building. Austin doesn't say you have to take them down. It just says you can't digitize them. An enforcement officer could determine whether you're in compliance or not in compliance without reading what is on the billboard. If everything on the billboard were written in Chinese and the enforcement officer can't read Chinese, the enforcement officer could still say you're in violation because they're digitized. That wouldn't be a content-based distinction. What am I missing? Justice Alito, the critical fact here is that the trigger for whether or not we can digitize our signs is whether or not our signs, as they exist, advertise on-premises or off-premises activities. If they advertise off-premises activities, they are forbidden unless they are grandfathered. Our signs are conceitedly in that category. They're grandfathered, so they're permitted, even though all of everything, as I understand it, again, correct me if I don't understand the facts, everything that is on your client's signs relates to something that is off-premises, right? In the conventional sense, not in the peculiar sense in which Austin defines the term. Well, in both senses, because the signs advertise activities that take place off-premises, and that is what renders them not permitted unless they are grandfathered. And, again, that is why we can't digitize our signs. So, Justice Alito, just to sort of explain for a minute how all of this operates, when we apply to digitize our signs, the reason that we can't do that is because we are not allowed to alter signs that are non-conforming or grandfathered. The sole reason that our signs are non-conforming or grandfathered is because they are classified as off-premises signs. So our submission to the court is, first, that that distinction is content-based, that because we were not permitted to digitize our signs because they were off-premises, the regulation should be subject to strict scrutiny. And, second, that the digitization ban itself, which is, after all, the regulation that we were challenging, is invalid under strict scrutiny. And, of course, the city makes no effort to argue that the digitization ban survives strict scrutiny, but, frankly, the city makes no effort to argue that it satisfies intermediate scrutiny either. In fact, both in the briefing and today at oral argument, Mr. Dreeben doesn't talk about the digitization ban at all. Instead, he simply talks about the on-premises, off-premises distinction in isolation. But, of course, that's just a definition. Could you address the regulations to which Justice Breyer referred, the many, many federal regulations that require disclosure of information? And there's some that, I'm not an expert on, let's say, food labeling regulations, but I don't think that's a particular thing unless certain requirements are met. What you need to be able to label something is juice or cheese. What would be the effect? I want to understand what we would be buying if we thought that if you have to read it, it's content-based argument. So I don't think that you would have to alter any of this court's well-established case law with regard to those sorts of regulations. And at least as I understood the examples, I think they are, in the main, all examples of compelled disclosures, and that's particularly, I think, most— There are plenty of the others. Peanut butter. Every lawyer in Washington before you were born was hired to argue yes or no that real, genuine peanut butter must have lard in it, otherwise it sticks to the roof of your mouth and isn't peanut butter. I don't know how the case came out, but it did say what could be labeled peanut butter. OK? If that isn't content-based, what is? And there are a lot like that. So again, I think with regard to compelled disclosure, the way that this court's case law operates, as I understand it, is that outside the context of commercial speech, the court generally applies strict scrutiny to compelled disclosures. But in the context of commercial speech, which I think would cover most of the examples like the SEC and so forth, the court applies the Zouderer test, which is a lower level of scrutiny, you know, probably closer to intermediate scrutiny. And I don't think that the court would have to, again, disturb any of that case law. Those were the examples that Justice Breyer cited in his concurring opinion in Reed itself. Well, one thing you'd certainly have to disturb is the Highway Beautification Act, right? What is your position on each of the provisions? There are five sign provisions. And under your theory, I suppose they would be unconstitutional. You can have directional and official signs, content-based, throw it out, right? I think those exceptions are content-based and would be subject to strict scrutiny. And then the question would be whether or not they survive strict scrutiny. Well, let's take another one. Signs advertising the sale or lease of property upon which they are located. Does that survive strict scrutiny? I think that the government in prior briefs has suggested that the analysis for each of those exceptions might operate somewhat differently. First, there might be different governmental interests. The government has cited with regard to the sale or lease of property exception the interest of property owners in fully marketing their own property. Are signs of historic or artistic significance? And I think that that exception, like the exception for on-premises signs, may be justified by a distinct interest, which is the safety-related interest in motorists getting necessary information about nearby services. That's the argument that the government itself has made. And so the question would be, first, whether the government can articulate a compelling interest, and second, whether the regulation at issue would be narrowly tailored. And I think it would be diluting our content-based test for you to say that those can't possibly satisfy it. Well, and high-marked signs, you know. I'm not here to defend the free coffee exception, Mr. Chief Justice. I think ultimately that would be a question for a court to analyze based on the evidence that the government induces for each of those exceptions. And I would note that the other thing about the Highway Beautification Act that makes it very covers a relatively limited area, the area within 660 feet of a covered federal highway. It excludes areas that are zoned in particular ways. The city of Austin's ordinance, the ordinance at issue here, by contrast, is quite broad. And again, all we're talking about today is the digitization ban. That is what our clients are challenging because our clients want the ability to digitize their off-premises signs. And I would invite the court to review the record in this case because there is simply no evidence in the record at all to justify what Austin did here, which is to permit the digitization of on-premises signs without any sort of limitation on brightness, message display time, and the like, limitations that are very common in other jurisdictions, but yet to say with regard to the small number of off-premises signs that are permitted in Austin that they can't be digitized. And I think that that's what makes this a very easy case. I don't think that the court needs to tackle the task of defining how its test for content neutrality would apply in every conceivable context in order to win my client's favor. Mr. Chairman, as you well know, people will pay close attention to the opinion. And unlike some of our decisions, this decision is going to affect every state and local official around America. And they spend a lot of money and a lot of time trying to figure out how to comply with the First Amendment implications of sign ordinances. So I'm just going to push back a little like, oh, this is a nice, easy, narrow case. You look at the amicus brief of the Planning Association, for example, I thought it was pretty telling about Metro Media. It said experts have spent decades in the intellectual wilderness disagreeing about Metro Media. Their debates leave planners in the same wilderness yet under the cover of night with no flashlight or map. You know, that's a pretty evocative way to describe what we potentially would be doing. So I think we owe some clarity. That doesn't mean you lose or win. I'm just saying the idea of, oh, we can just kind of do a little narrow thing. I'm not sure. Well, I appreciate that, Justice Kavanaugh. But I think that the way to provide that clarity is simply to reaffirm the test that this court articulated in Reed. And I think notwithstanding the suggestion that there is going to be a wilderness if this court rules in my client's favor, I think that what we have learned from experience is that— Sorry to interrupt, but to stop you there, I think there was confusion after Reed about on-premises, off-premises, because it was unclear where a majority of the court was in the wake of the different opinions. Now you're saying go with the distinction is content-based and does not work, except in response to the Chief Justice. You're saying, well, maybe they're maybe here, maybe there. That's going to be a—I'm not saying you lose because of this, but I just think you need to acknowledge that's going to be a lot of time and money for a lot of local jurisdictions around America. So I would say two things in response to that, Justice Kavanaugh. First, that I think the jurisdictions in the wake of Reed over the last six years have already modified their signed ordinances in important respects. But some of them rolled the dice on the on-premises, off-premises, because they couldn't figure out which way that went from Reed. That is correct. Many of them did modify those definitions to render them unambiguously content-neutral, but some, like Austin, didn't. And Austin in 2017 overhauled its city code explicitly in reaction to Reed, but it left the definition of off-premises signs materially undisturbed. So I think in some sense— Like a lot of jurisdictions. Like some jurisdictions have. I'm willing to concede that. My point to the Chief Justice— But I want to nail that down a little bit further. You pointed out that Austin has since modified its statute here, so it only applies to commercial speech, which guarantees intermediate rather than strict scrutiny under our precedents. How many jurisdictions, to your knowledge, are left that are, in Justice Kavanaugh's words, rolling the dice without making that distinction or pursuing some other option like Colorado or Chicago has? There are a number, Justice Gorsuch, and it's frankly hard to quantify. And part of the reason why that's true is that many states have state laws that simply track the definitional provisions of the Highway Beautification Act. So I don't mean to minimize the fact that there are many jurisdictions that have laws that draw these distinctions. I would just make two points. The first is that, as I said in response to the Chief Justice, the way that the strict scrutiny analysis would operate is going to depend on the type of regulation at issue. Again, it's very nice to sort of discuss the definition of on-premises and off-premises signs in isolation. But of course, the real question is what restrictions or regulations flow from that definition. And the analysis for a law like the Highway Beautification Act, which permits on-premises signs but prohibits off-premises signs, is, I would submit, potentially different from the analysis on the digitization ban. What makes this such an odd case is that Austin permitted a small number of off-premises signs to remain and yet forbade the owners of those signs from doing what the owners of thousands of signs in Austin have been permitted to do, which is to convert them to digital signs, which enables the owners of those signs to display many more messages and to do that much more efficiently. With regard to what Austin did, Justice Gorsuch, I would just add one further thing, which is that in 2017, it is true that Austin permitted the display of non-commercial signs. But Austin did not materially modify the definition of off-premises signs, which is the trigger for the digitization ban at issue here. And so I think that the parties are in agreement that even under the post-2017 regulatory regime, we would not be permitted to convert our signs to digital signs. And again, ultimately, whether it's strict scrutiny or intermediate scrutiny, the government of course bears the burden of coming forward with evidence. It is true that the degree of— Can I ask you a doctrinal question there to shift gears for me? I understand your content-based argument. The church hypo is a good one for you that you gave earlier, and then we'll get into the tiers of scrutiny. But what role does history and precedent play in that? And one of the themes of the amicus briefs in particular is these things have been around for a long time, on-premises, off-premises distinctions. And that has coexisted with the First Amendment in the same way that long-standing regulations have coexisted with the pre-exercise or with the Second Amendment, and they're trying to fold in that. How do we think about that? Is the history wrong, or how do we think about it? Yeah, Justice Kavanaugh, I wouldn't stand here and say that in 1789, there were a lot of on-premises— Well, the issue didn't arise until the 20th century, really, so I think that's going to work for you. I think if you had to sort of point to some event, I would probably point to the enactment of the Highway Beautification Act, precisely because once the federal law drew that distinction, many states, in order to ensure that they were in compliance with federal law, adopted similar restrictions. At the same time, obviously, those restrictions have been subject to challenge for some time. Metromedia itself involved a challenge to that distinction. And so I tend to think, look, the Court should obviously take into account the fact that other jurisdictions have these regulations, but I don't think that that should be dispositive any more than it was—than in Reed itself, that there were other jurisdictions that drew very similar distinctions between political signs and temporary directional signs and the like. And really, our submission with regard to the test, which, as you say, Justice Kavanaugh, is obviously important in other contexts, is that the Court really can treat this as exactly analogous to the definition of temporary directional signs that was really at issue in Reed. Yes, the Court talked, and Mr. Dreven talked today, about the other categories of signs, political and ideological signs and the like. I think those other categories tended to confirm that the town of Gilbert was rampantly drawing content-based distinctions. But when you look at the very provision that was being challenged, the definition of temporary directional signs, that provision was exactly like the provision at issue here, in that there was some other factor in addition to content that governed how the regulation operated. There it was the occurrence and timing of an event. Here it is the location of the sign. But that simply defines the restriction. It defines the restriction on the speech that is permitted or not permitted. And so there is no respect in which the on-premises, off-premises distinction is different, other than that it is location rather than the timing of an event. Can I pick up on one of Justice Gorsuch's questions? He said on-premises, off-premises, at least as to commercial advertising, if I understood the question, might be different, and that folds then into the metromedia precedent, which seems to suggest that that would be permissible. Your response? Our view is that when you consider the discrete type of regulation at issue here, the digitization ban, that it would not survive even intermediate scrutiny. Metromedia itself involved an outright prohibition on off-premises signs, and I would submit that the analysis there could be different because the fit between the interests that are asserted and the regulation at issue could be analyzed in a different way. And so in our view, all that the court needs to do here is to say, as Justice Kagan suggested in her concurring opinion in Reed, that this digitization ban does not survive either strict scrutiny or intermediate scrutiny if the court doesn't want to provide guidance on the question of whether on-premises, off-premises distinctions are subject to strict scrutiny across the board. And in our view, because of the examples that we have given, I think that it is clear that an on-premises, off-premises distinction that turns on whether or not a sign advertises on-premises or off-premises activities is a paradigmatic example of a regulation that distinguishes between different types of communicative content. We've talked about the example of a church that is limited in the speech that it can display on a sign on its premises. And I think many of the other examples that we have discussed today really drive home the extent to which this is a distinction based on content. We talked about the example involving Franklin's Barbecue. Franklin's Barbecue could obviously put up a sign in Austin on its premises advertising Franklin's Barbecue. But let's say that there's a sign across the street. And let's say that Salt Lick, another famous barbecue restaurant whose primary premises is outside the city limits, wants to say the best barbecue is actually two miles down the road. It would be disabled from doing that under Austin's ordinance. And there was a colloquy earlier, I believe, between my friend Mr. Snyder and Justice Gorsuch about how the court should think about the effects of the regulation. We're certainly not suggesting that merely because this has a disproportionate effect, it is a content-based regulation. But I think that helps to drive home the ways in which this regulation really does draw a distinction based on the subject matter. And again, we think that a test that says that if you have to examine the content of the sign to determine whether or not the regulation applies, it's going to be an easily administrable test that is not going to disrupt any of this court's judgment. Suppose a city has two categories of sign regulations. One is for signs that are in front of a building.  And it says that signs in the first category may not exceed a certain size. Signs in the second category may not exceed a smaller size. Is that content-based? No, that isn't content-based, because that depends entirely on the location. And so similarly, as the Sixth Circuit suggested in the Thomas opinion, if a jurisdiction said that it would define an on-premises sign as any sign that is within a certain distance of a building and an off-premises sign as any sign that is further away, that too would be okay. What is the difference between that and what happened here? You have certain signs. I'll come back to my first question. I still don't quite understand the answer. You have certain signs. Boston doesn't say you have to take them down. It just says you can't digitize them. And that isn't a content-based distinction between a digitized sign and a non-digitized sign. Maybe it's not a defensible distinction, but it doesn't seem to be content-based. Justice Alito, the critical fact is that the trigger for the digitization ban, for the differential treatment, is whether or not the sign advertises off-premises activities. And that requires an examination of content in a way that your hypothetical, which depends entirely on the location, does not. Thank you, counsel. Justice Thomas, anything further? Justice Breyer? Sure. Justice Alito? Justice Hayden? Mr. Shanmugam, I mean, I guess the question is, yes, you can say that there's a piece of content that triggers the restriction. It has to advertise off-premises activities. You said before Justice Alito couldn't possibly have meant what he said in his concurrence, because after all, the way he framed that piece of the concurrence, it would have applied, for example, if the trigger was religious speech or political speech. And he couldn't have meant that, and I'm sure he didn't mean that. The question is whether we should treat a trigger of religious speech or political speech or speech by Republicans or speech by Democrats or all the kinds of triggers that we understand to be dangerous and that we understand to be content-based, as we have always used that label, whether that trigger should be treated in the exact identical way as the trigger in this law, which is, does it advertise off-premises activities? I think that that's the issue, and I'm just wondering why you would say that those two triggers should be treated in an identical way. I grant you, Justice Kagan, that in the hypothetical involving religious speech, there's a much stronger sense that something nefarious is going on, that the government in religious speech and is singling out a particular type of subject matter. But in some sense, the whole point of the framework that this court established in Reed, and I don't think it was inconsistent with this court's past precedents, was a framework that looked first to the face of the regulation and only after that to the purpose of the regulation. And the court made clear that even in cases where it might seem as if regulation is benign or reasonable, the court still has to take that first step and determine whether or not the distinction is content-based on its face. And as I indicated to Justice Gorsuch, I do think that there is a sense in which a regulation like this is distortive. It could have been designed to favor local businesses. It could have been designed to put a thumb on the scale. That's always true of speech restrictions, including restrictions that we would understand all of us to be content-neutral. You know, if you have a regulation that says, there shall be no sound trucks in the city after 8 p.m., there are various ways in which that can be distortive and in which it can affect certain speakers more than other speakers. Down that road, madness lies, and the court has never gone down that. I agree with that. And I think that all that the court said in Reed is that where you have a distinction that on its face depends on the content of speech, that's a reason to look more closely. And I do think that this regulation falls squarely into that category because of the hypotheticals that we have set out. There is no question that this regulation requires— I mean, I do think, Mr. Stedman, that formally one can understand this in exactly the way you say. You have to examine the content. So formally, one can understand this as content-based, even though I think the court has defined that term more narrowly. But put that aside. I mean, it's formally true that you have to examine something about the content. But just to go back to the Chief Justice's questions, I mean, there are some laws where, you know, the laws of lots of municipalities have these laws that say you can't have illuminated signs unless the illumination is for your address or for your name so that people can identify. There are some laws that sort of scream out not to worry in terms of any First Amendment values. Now, we can do two things with those laws. As I understood what you said to the Chief Justice, you said, well, don't worry because the strict scrutiny analysis can be different. And I guess I would say, and I think he said, that's the thing to worry about is diluting the strict scrutiny analysis. The thing not to worry about is drawing some kind of sensible line which takes laws like this one and puts it on the other side of the content-neutral, content-based divide. I do think, Justice Kagan, that in a lot of those hypotheticals, regulations at issue are easily going to satisfy strict scrutiny. In many of those hypotheticals, what you're doing is really defining a medium of speech. That was true, for instance, in Taxpayers for Vincent, where the court analyzed temporary signs as itself a medium. And that may be possible with regard to categories such as directional signs, depending on how the category is defined. But I think that what we haven't seen in the wake of Reed is a great deal of chaos in the lower courts. Yes, we do have a circuit conflict on this very specific question of whether on-premises, off-premises distinctions are subject to strict scrutiny. But the reality is that jurisdictions have been coming into conformity with this Court's decision in Reed. There isn't an avalanche of litigation about this issue. And I do think that some regulations that distinguish between on-premises and off-premises signs, including potentially the Highway Beautification Act, are going to survive strict scrutiny. That is obviously a case-specific analysis that depends on the evidence that is induced to justify the particular regulation. What makes this case such an artificial case in which to be discussing this issue is because Austin simply has no justification for the differential treatment when it comes to the digitization ban, given that Austin is permitting digital signs on-premises with complete abandon and without any limitation. Justice Gorsuch? Let me give you some examples. I just want to understand how this would cash out. Let's say a sign just says, Black Lives Matter. I think we'd agree that that's not an off-premises sign because it doesn't identify any particular location. Is that right? Yes, I would say that that would not qualify as an off-premises sign because it's not advertising an activity. What if Black Lives Matter has a local office and it isn't there? Well, I mean, it would be a question for Mr. Dreeben. I think he would say that that sign does not advertise an activity, business, or person. So that one's okay? Potentially so. How about if it says Black Lives Matter, do something about it, anticipating an upcoming rally, but no information is provided? I mean, that seems like it might be advertising an activity at that point. And again, I don't mean... So that one might not be permissible. And then what if it gives a date and a time of the rally? At that point, it seems more clearly to be advertising a particular activity. And so an official would have to... Somebody's going to have to read this and decide which side of the line these four examples fall on. Well, I think that that's right. And I think what I would say is that the examples that were in the Fifth Circuit's opinion illustrate that this is not a case in which a mere cursory examination of content is necessarily going to be sufficient. There are hard questions about whether a particular sign would qualify. And I think it was telling that my friend Mr. Dreeben, when he was asked the question about the vote for person X sign, said, well, there was this exception in the ordinance for political signs. That is true. But the really fundamental question is, would a sign like that be advertising a person not at the premises? I think the answer to that is yes. But that would be a matter for Austin sign regulators to decide. And I think that really drives home why this requires not just an examination of content, but particularly a close examination of content to determine whether or not it is regulated. Justice Kavanaugh? Justice Barrett? Thank you, counsel. Rebuttal, Mr. Dreeben? Thank you, Mr. Chief Justice. Three quick points on the record and three substantive points. First of all, Justice Thomas, in response to your question to me, the read the sign language appears in the Fifth Circuit's opinion at pages 14a and 19a of the petition appendix. That's the test that the court applied to identify something as facially content-based. Second, a respondent invited this court to read the record to determine what Austin said in the district court. I invite the court to read the record on what Austin argued in the district court and on appeal. Austin did not appeal the intermediate scrutiny holding of the district court. Its sole appeal is on the theory that strict scrutiny applied because the law is content-based by virtue of its distinction between on-premises and off-premises advertising. So I think the intermediate scrutiny question is not here, and it's for the Fifth Circuit to decide whether it's waived. And then finally, Justice Thomas, your question about commercial speech and whether respondents' billboards could be regulated as such, respondent said that the question presented is about the facial validity of the statute under strict scrutiny, and that is correct. The question presented asks whether the statute is facially invalid under strict scrutiny by virtue of the on- and off-premises distinction. The answer is no, because as respondent concedes, commercial billboards can be regulated off-premises while on-premises commercial signage is permitted. And at JA-29, Austin squarely premised its denial of the digitization permit request on the commercial speech that respondents' billboards display. Now, substantively, we've talked a lot this morning about how strict scrutiny is the highest rung of review that the court applies, and that applying it where it is not jurisdictions. Now, that does not mean that they get a free pass. If strict scrutiny is not applicable because of the text, the face of the statute, as we submit it should not be here, you still have the question whether the law can be justified without reference to the content. If it cannot, it goes to strict scrutiny, except insofar as this court carves out  examples that Justice Breyer has been talking about from the strict scrutiny category, even though they regulate content. You still have intermediate scrutiny, and laws can fail that, as they did in McCullen and in the City of Ladew case with respect to a total preclusion of residential signage. The jurisdiction lost that. And, Mr. Chief Justice, if I could finish one point. In response to your question, Justice Barrett, about the prevalence and alternatives of this kind of regulation, it remains extremely prevalent, and in our petition reply brief in Appendix B, we collected a sampling of laws that still reflect this. Jurisdictions have found that it works. Other things do not. And accordingly, we ask the court to reverse the judgment on the Fifth Circuit with respect to its holding that strict scrutiny applies to Austin's law. Thank you, counsel. The case is submitted.